W. C. HAWKINS ET AL., Appellants, v. FRED C. COX ET AL.—66 S. W. (2d) 539.

Division One, December 22, 1933.

*Rufe Scott* and *G. W. Thornberry* for appellants.

*Tom R. Moore* and *Moore & Moore* for respondents.

STURGIS, C.—This suit is by injunction, the plaintiffs being tax-paying citizens of the Jamesville Special Road District of Stone County and the defendants being the three commissioners of such special road district, the county treasurer and *ex officio* treasurer of the special road district, and the Weber Implement and Auto Company, payee of certain warrants issued by the road district. The gist of the action is that the Jamesville Special Road District had entered into an alleged illegal contract with the Weber Company in the pur-

chase of a caterpillar tractor and equipment for use in constructing and grading roads, and plaintiffs seek to enjoin the performance of such contract, including the payment of the warrants issued in payment for such road machinery.

It appears that the Jamesville Special Road District was duly formed and incorporated under Article 10 of Chapter 42, Revised Statutes 1929, Section 8061 et seq. It is a rural road district with power to build and improve roads by benefit assessments against the land in the district, but that is not what is involved here. Under Section 8067, Revised Statutes 1929, the commissioners of said road district "have power to levy, for the construction and maintenance of bridges and culverts in the district, and working, repairing and dragging roads in the district, general taxes on property taxable in the district." In addition to the revenue derived from that source, it is provided by Section 8066, Revised Statutes 1929, that "county courts shall levy on the property taxable in every such incorporated district such taxes as may be levied by the authority of section 7890 on property in districts not incorporated, and such taxes when so collected shall be set aside to and placed to the credit of the district in which the property was taxable; and county courts shall cause to be set aside and placed to the credit of each road district so incorporated all taxes collected, on property taxable therein, by authority of Sections 7891 and 8161, Revised Statutes 1929, or either of said sections." Under these and other statutes referred to, it is settled that this special road district is entitled to whatever taxes are levied and collected on property within its boundaries, whether levied by the road district itself under Section 8067, or by the county court under Sections 7890 and 7891, Revised Statutes 1929. [State ex rel. v. Barry County, 302 Mo. 279, 258 S. W. 710; State ex rel. v. Holman, 305 Mo. 195, 264 S. W. 908; Billings Special Road District v. Christian County, 319 Mo. 963, 5 S. W. (2d) 378.] The revenues which are thus collected and may be expended by the special road district are derived from general taxes and are distinct from and in addition to the funds derived from special tax assessments against land within the district under Section 8073, Revised Statutes 1929, or from special assessment bonds issued under such statute payable only out of moneys derived from such special tax bills. Such special road district is also authorized to borrow money by issuing bonds payable out of the funds derived from the general taxes levied and collected on the property within the district. This, however, requires a vote of two-thirds of the voters voting at an election held for that purpose, and special taxes must be provided to pay such bonds and the interest thereon annually.

. It is not shown when the Jamesville Special Road District was formed and incorporated, but it appears that it was a going concern in February, 1928, and at that time the three named defendants, Fred O. Cox, V. Z. Cox, and E. L. Cloud, were the lawful commissioners of such district. Such commissioners, acting for the road district, then entered into a contract to purchase from the Weber Implement and Auto Company, for the use of the district, the road machinery mentioned at the price of $2500. The road district had on hands sufficient money to make a cash payment of $500 on such purchase and also paid the freight on same amounting to $93. This payment practically exhausted the funds of the district then on hand. The machinery was delivered on this payment and it is certain that the whole purchase price was $2500, the amount not paid to bear interest at six per cent till paid.

It is a little difficult to ascertain the exact terms of the purchase contract. No formal written contract seems to have been made and if any memorandum of the purchase was entered in the minutes of the proceedings of the road district, same was not produced at the trial, and if any order for the machinery was given to or received by the Weber Company, that was not produced. There is no document or writing whatever relating to the transaction put in evidence as shown by the record. Not even the warrants issued in payment of this machinery were put in evidence. The parties tried the case without objection on oral evidence only, although the statute, Section 8064, plainly requires that "the secretary shall carefully keep a true record of all warrants drawn on the treasurer and all written contracts that may be entered into on behalf of the district, shall attest such warrants and the execution of such contracts, keep minutes of the meetings of the board, and perform such other duties as the law may require. All money paid to the county treasurer and placed to the credit of the district shall be paid out only on warrants signed by the president or vice-president and attested by the secretary, except as may be otherwise authorized by law."

At the beginning of the trial, which was had in March, 1929, the parties agreed upon and stipulated these facts: "1. That the assessed valuation of all property in the Jamesville Special Road District in Stone County, Missouri, available as a basis for the levy of taxes, at the time of the making of the contract alleged by plaintiffs was $120,000. 2. That defendants as Commissioners of said Jamesville Special Road District in Stone County, Missouri, made a contract for the purchase of road building machinery *as alleged in plaintiffs' petition* to the amount of $2500." The allegations of the petition are that on the ——— day of ———, 1928, the named road commissioners "entered into a contract and agreement with the de-

fendant Weber Implement and Auto Company whereby'' said commissioners ''undertook to bind and fix upon the said Jamesville Special Road District under an instrument of writing, to pay the said Weber Implement and Auto Company for road machinery certain sums of money in excess of the revenue of the said district.'' It can hardly be said, however, that in admitting that the road commissioners made a contract for the purchase of road building machinery ''as alleged in the petition to the amount of $2500,'' it was intended to admit that same was ''in excess of the revenues of the district.'' It also stands admitted that no election was held in this road district authorizing the commissioners to make any contract to purchase road machinery or to incur any indebtedness therefor, or to issue bonds or levy taxes for the payment of such indebtedness.

The evidence was heard in March, 1929, and the clearest version of the terms of the contract to purchase this road machinery is given by one of the commissioners, Fred O. Cox, who testified: ''I was one of the commissioners of this road district at the time this contract was made. We purchased a five-ton, Cletrac caterpillar tractor. We paid $500 down on it and freight amounting to $93, the best I remember. Then we gave two warrants, I don't remember what amount, covering the balance of the payments. The contract price was $2500. The two warrants were given after we made the initial payment.

''Q. Do you know when they were due and payable, these two warrants? A. Well, there is this contract between us; we are to pay $500 and the interest yearly until it is paid out, the payments being the first day of April, this year. That is on the $2000 balance. The rate of taxes last year was fifty cents on the $100 valuation.

''Q. You say you have a contract with this implement company that you were to pay $500 a year? A. Five Hundred Dollars and interest yearly, until the sum of $2000 and interest is paid. Now understand that is not in accordance with the warrants. We gave warrants for two payments in order that they would become commercial paper, could be handled through the clearing house, but our contract is $500 a year.

''I don't know the rate of taxation this year (1929). I don't know whether the County Court had stipulated their part or not. Ours is twenty cents (twenty-five cents); if they put on fifteen it will be thirty-five; if they put on twenty it will be forty. There is no other indebtedness against the district, that is all we owe, what we owe the Weber Implement and Auto Company.

''(Cross-examination) Q. Mr. Cox, have you a record of the contract entered into for the purchase of this machinery? A. No, I don't think we have any record of that at all, that is, between us and the company. It is not reduced to writing. There is no written contract,

only the order of the board to buy the machinery. I have no records of the district, they are in the hands of Bird O. Sims, the clerk. The contract to buy this machinery was made possibly some time in February, 1928.

"Q. You just made a contract verbally with the agent of the company? A. We had bought quite a little machinery before this from this same company and we just always made our contracts and gave the warrants.

"Q. You issued how many warrants and what denominations? A. I couldn't tell the denominations, but there were three warrants issued to cover the entire $2500.

"Q. Did you have a written contract that $500 was to be paid each year? A. No, sir, we didn't have any written contract to that effect; but, we had done this same kind of business with the same company several years prior to this; we had always paid that way.

"Q. Were these warrants drawn on the revenue of any particular year; and state in the warrant when they were to be paid? A. Well, I think they were drawn to fall due on the first day of April; I don't know whether they specified the year, I kind of believe they did; I don't remember the year.

"Q. You mean $500 to be due the first of April each year? A. Whatever the amount was; it was over $500; it was $500 and interest. We were to pay $500 and the freight in 1928, leaving a balance due of $2000.

"Q. That would take four years then more after the year 1928 to finish paying it out? A. That is our verbal contract with the company, at six per cent interest. I think this was in February, 1928. The commissioners had levied thirty cents (twenty-five cents), I believe, and the county twenty, making fifty. At the time we purchased the machinery in February our road tax was fifty cents on the $100 valuation.

"Q. And you didn't undertake to make any kind of assessment or levy for the full amount of this indebtedness you had contracted at that time? A. No, sir, our road tax has been somewhere in the neighborhood of $600 a year.

"Q. You just made the usual levy and contracted an indebtedness to be paid yearly for the next four years? A. That is right. We figured that the 25-cent levy would take care of the payments and interest. We figured we would pay $500 and interest and have a small balance left except the poll tax. We didn't figure to make a levy to wipe out the entire indebtedness in that year.

"(Redirect examination) Q. You say that the revenue or the amount raised from that fifty-cent levy or that you could expect from all sources in that district would be how much? A. Well, it run in the neighborhood of $600. This did not include poll taxes. Includ-

ing poll taxes it would be about $730. The clerk said yesterday he was able to take care of the payment due the first of April (1929)."

V. Z. Cox, another commissioner, testified: "I was one of the commissioners of this road district at the time this contract was made and am commissioner now. The district received the machinery purchased from the Weber Implement and Auto Company and the district is now using it, used it last week and this week four days. We also used it last year. When the board met and bought this machinery they figured on our revenue, by running a twenty or twenty-five cent levy, the revenue would take care of the warrants drawn to pay for this in payments by the skin of our teeth; if it didn't do it there was an agreement they would take care of the balance. We would pay what we could and they would take care of the balance. That was the agreement with the agent of the company. I don't know whether we issued three warrants or not, I know we paid $500 down and paid the freight. I think there is $2000 outstanding yet. We could expect a twenty-five cent levy to bring in around $700."

We gather from this evidence that this road district had usually levied and did levy in 1928, the year this machinery was purchased, a general levy of twenty-five cents on the $100 valuation on the property of the district, and that the county made a like general levy which would be apportioned to the road district, thus giving to the road district the proceeds of a fifty-cent levy each year. This yielded a revenue of about $600 per year on the assessed valuation of the property in the road district. This was the revenue provided for the year 1928, in which the contract to purchase this road machinery was made.

This road district is given authority under Section 8065, Revised Statutes 1929, to construct, improve and repair highways and bridges and is enjoined to keep same in good condition, and to this end is authorized to "employ hands and teams" and to "rent, lease or *buy* teams, implements, tools and machinery; all kinds of motor power, and all things needed to carry on such work."

The question presented here is whether the road district in question exceeded its powers in this respect, under its then financial condition, in making the contract of purchase just referred to, and if so, to what extent. We think the first question must be answered in the affirmative. Municipal corporations, such as are special road districts, are by our Constitution placed on what has been termed a cash basis. This has been accomplished by the provisions of Section 12, Article 10 of the Constitution, which provides that "no county, city, town, township, school district, or other political corporation or subdivision of the State shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the consent

of two-thirds of the voters thereof voting on such proposition, at an election to be held for that purpose." The plain meaning of this constitutional provision is that any such municipal corporation may spend or contract to spend (become indebted) "in any (calendar) year the income and revenue provided for such year," but beyond that it cannot go in creating a debt for any purpose or in any manner, except by consent of two-thirds of the voters. This was so held in Book v. Earl, 87 Mo. 246, where this court said: "The contracting of a debt in the future, by the county in any manner or for any purpose, in any one year exceeding the revenue which the tax authorized to be imposed would bring into the treasury for county purposes for such year, unless expressly authorized to do so by the assent of two-thirds of the voters" is prohibited. "The evident purpose of the framers of the Constitution and the people who adopted it was to abolish, in the administration of county and municipal government, the credit system and establish the cash system by limiting the amount of tax which might be imposed by a county for county purposes, and limiting the expenditures in any given year to the amount of revenue which such tax would bring into the treasury for that year. Section 12, supra, is clear and explicit on this point. Under this section the county court might anticipate the revenue collected, and to be collected, for any given year, and contract debts for ordinary current expenses, which would be binding on the county to the extent of the revenue provided for that year, but not in excess of it."

This provision of the Constitution is self-enforcing and limits the power of this road district "to become indebted in any manner and for any purpose" beyond the revenues provided for the year. Under the facts here, "the income and revenue provided for the year" 1928, in which the contract was attempted to be made, was whatever would be derived from the levy of fifty cents then made on the $100 valuation of the property in the district, amounting to approximately $600. The contract of purchase being made in February, 1928, the commissioners had a right to contract with reference to the funds then on hand as a cash payment and the anticipated tax collections of that year on the rates levied, as such was "the income and revenue provided for that year," but no further. The road district had no power by contract of purchase made in February, 1928, to anticipate, appropriate or tie up the revenues of the district for 1929 or after years not yet levied and the amount of which would depend on levies to be made, if at all, in such years. In Trask v. Livingston County, 210 Mo. 582, 109 S. W. 656, the county *in September, 1889,* contracted to have a bridge built to be paid for in a fixed amount when completed. It was not accepted by the county till in May, 1890, when warrants were issued for its payment out of the *revenues for 1890.* The court said: "When the county became indebted on these bridge contracts

must be determined by the 'income and revenue provided for such year,' which, under the Constitution must be looked to for the payment of such indebtedness and it was the 'income and revenue provided' for the year 1889, which the county court was authorized to appropriate for that purpose, and not the revenue for the year 1890, which at the date of the contract for the building of said bridges, had never been assessed, levied or collected. The language of the Constitution is, 'No county . . . shall be allowed to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year.' It has been uniformly construed that this provision of the Constitution permits the anticipation of the current revenues to the extent of the year's income in which the debt is contracted or created and *prohibits the anticipation* of the revenues of any future year. Any other construction would render Section 12 of Article 10 nugatory, for, if the County Court of Livingston County in September, 1889, could anticipate the revenues of 1890, it could also anticipate the revenues of 1891 and 1892, and would leave the power of the county court with reference to indebtedness what it was before the Constitution of 1875 was adopted. . . . Clearly the county court was not authorized to appropriate revenues which were to be derived from taxation in the year 1890, when such taxes had never been assessed, levied or collected. While the county court may in any one year draw warrants, after the revenue has been provided and the taxes levied within the scope of the levy and income for such year, it is too plain for argument that the Constitution forbids the anticipation of the revenues of any subsequent years; if not, all that has been said in regard to the force and effect of Section 12 of Article 10 of the Constitution to the effect that its purpose was to put counties upon a cash system instead of the old credit plan, has been in vain.''

The contract for the purchase of and payment for this road machinery made in February, 1928, is void at least to the extent it attempted to obligate the district for payments beyond the cash payment made at the time and the amount to be paid out of the revenues provided for 1928. [Anderson v. Ripley County, 181 Mo. 46, 65, 80 S. W. 263.]

Defendant argues that a special road district like this one is not limited in the rate of taxation by the provisions of Section 11, Article 10 of the Constitution, nor is it so limited by Section 8067, Revised Statutes 1929; and that the only limitation is that imposed by Section 12, Article 10 of the Constitution as to the amount of the indebtedness, not to exceed five per cent of the assessed valuation, which it may incur on a two-thirds vote. The case of Harris v. Bond Company, 244 Mo. 664, 692, 149 S. W. 603, is cited to the proposition that such road districts are not limited as to rates of taxation which

they may levy by Section 11, Article 10 of the Constitution and the amendment thereto, now Section 22 of Article 10, Constitution of Missouri. Whether this is true or not since the adoption of Section 23 of Article 10 of the Constitution in 1920, we need not determine, as in any event such road districts are subject to the provisions of Section 12, Article 10, limiting the power of such road districts to incur indebtedness in any one year to the revenues provided for that year, that being the only question here. We do not at all agree that the limit of such indebtedness is measured by the amount of revenue which the district *has authority to provide* in any year, but is limited to what it actually levies for the year—that being "the income and revenue provided for the year." Even if this district could have levied a rate for 1928 high enough to have paid the whole amount contracted for this road machinery, the fact remains that it did not do so.

It is also urged by plaintiffs that the contract for the purchasing of this road machinery is void for the reason that it is not in writing, as required by Section 2962, Revised Statutes 1929, which provides: "No county, city, town, village, school township, school district, or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of such contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing." Section 8064, Revised Statutes 1929, relating to special road districts, requires, as we have seen, the secretary of the road district to keep a true record of all written contracts entered into on behalf of the district and shall attest the execution of such contracts. That such contracts, in order to be valid, must be in writing is the uniform ruling in this State. [State ex rel. v. Grinstead, 314 Mo. 55, 78, 282 S. W. 715; Brown Coal Co. v. City of New Madrid (Mo.), 208 S. W. 109; Crutchfield v. Warrensburg, 30 Mo. App. 456; State ex rel. v. Dierkes, 214 Mo. 578, 589, 113 S. W. 1077; Terry v. Board of Education, 84 Mo. App. 21, 25; Woolfolk v. Randolph County, 83 Mo. 501, 505; Montague Compressed Air Co. v. Fulton, 166 Mo. App. 11, 30, 148 S. W. 422.] There can be no implied contract in cases like this for the statute requires the contract to be in writing, and that excludes any valid contract being implied from the furnishing, on the one hand, and the acceptance and use, on the other, of labor and material beneficial to the road district. [Carter v. Reynolds County, 315 Mo. 1233, 1238, 288 S. W. 48.] As to this the court said in Trask v. Livingston County, supra: "It can be stated, as the settled law in this State, that, if the bridge company

had without any public letting, written contract, or appropriation built these bridges and completed them on May 19, 1890, and the county court had on May 20, 1890, issued warrants for what it conceived was the reasonable value thereof, such warrants would not have constituted a valid indebtedness of said county. (Cases cited.)'' In Metz v. Warrick, 217 Mo. App. 504, 511, 269 S. W. 626, the court said: ''The statute, Section 2164, Revised Statutes 1919, requires all contracts with school districts to be in writing, and hence a school district cannot be held liable on *quantum meruit* or any sort of implied contract. (Cases cited.)'' [Hillside Securities Co. v. Minter, 300 Mo. 380, 392, 254 S. W. 188.]

It is pointed out, however, that plaintiffs have not alleged as a ground for injunction that the contract in question is void because not in writing, and therefore the case was not tried on that theory. This is true, and while the evidence now before us clearly shows that there was no written contract entered into, yet were this the only ground of its invalidity, the case would be remanded for new trial in order that the question of there being a sufficient writing to evidence the contract might be fully developed by the evidence, but as the contract is void as violative of the constitutional inhibition against becoming indebted to an amount exceeding the income and revenue provided for the year in which the contract was made, it would be useless to do so.

■ While we must declare the contract for the purchase of this road machinery and the unpaid warrants issued in payment of same to be void, the road district will be met with the proposition that, the purchase contract being void, the title to the road machinery remains in the seller, the Weber Company, and has not vested in the district. [Sparks v. Jasper County, 213 Mo. 218, 112 S. W. 265; Roeder v. Robertson, 202 Mo. 522, 100 S. W. 1086; Hillside Securities Co. v. Minter, 300 Mo. 380, 391, 254 S. W. 188.] It is not for us to say how the road district will work out this problem, but it will be on the basis that the district is not hampered by the contract of purchase, nor does it own the property attempted to be purchased. The court should not grant all the relief prayed for by plaintiffs. ■ It cannot restrain the district from levying taxes or receiving and using the taxes levied by the county court on the property within the district. Such taxes are levied and collected not for any particular purpose, but for the general purpose of constructing, improving and keeping in repair the roads, bridges and culverts within the road district, and such district has the right to use this revenue to rent, lease, or buy teams, implements, tools and machinery, motor power and all things necessary to carry on such work, subject to the constitutional and statutory restrictions in so doing. The board of

commissioners in authority during any year must be left free to contract and spend the revenues provided for that year unhampered by the contract in question.

The case is, therefore, reversed and remanded with directions to enter a decree declaring void and non-enforceable the contract in question for the purchase of the machinery in question and the warrants issued in payment of the same, and enjoining the defendants from paying any such warrants and from carrying out or enforcing such contract. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by STURGIS, C., is adopted as the opinion of the court. All the judges concur.